[No. 28167-1-III.   Division Three.   September 19, 2013.]

*In the Matter of the Detention of* ROLANDO REYES.

*Eric J. Nielsen* and *Christopher Gibson* (of *Nielsen Broman & Koch PLLC*), for appellant.

*Robert W. Ferguson, Attorney General, Sarah Sappington, Senior Counsel,* and *Jana R. Hartman* and *Brooke E. Burbank, Assistants,* for respondent.

¶1   KORSMO, C.J. — Does a litigant have standing to assert the public's right to attend a motion hearing in a civil case where he did not assert his own right to do so? This appeal from a sexually violent predator determination requires us to face this question and others concerning the meaning and scope of art. I, § 10 of our state constitution. We conclude that the provision creates a right of public access to the courts that can be asserted by a litigant in his own behalf, but may not be asserted by the litigant on behalf of others (the public). We affirm the bench verdict.

## BACKGROUND[1]

¶2   While appellant Rolando Reyes was imprisoned for residential burglary, the attorney general petitioned in 2004 to commit Mr. Reyes to the Special Commitment Center (SCC) to await trial as a sexually violent predator (SVP). The petition was dropped after he was convicted of twice committing custodial assault with sexual motivation while at the SCC.

¶3   The petition was refiled in 2008 when his 36-month sentence for the two custodial assault convictions was ending. He moved to dismiss, arguing that the attorney general lacked authority to bring the petition and that it should not have been filed in Benton County. The motion

---

[1] The facts and procedure relating to the public trial question are discussed in this section, while the factual matters relating to the trial are discussed in the unpublished portion of this opinion in conjunction with the analysis of the trial issue.

was heard by telephone, with the assistant attorney general appearing from her office in Seattle. The record reflects that the judge, two attorneys representing Mr. Reyes (one of whom was then serving as guardian ad litem), and a court reporter were present in chambers for the motion hearing.[2] After hearing argument, the court denied the motion to dismiss. Counsel for Mr. Reyes indicated that they had a signed jury trial waiver on hand and asked for the State's telephonic approval of the waiver. Counsel for the State noted that she had filed the jury demand and advised the court that she would withdraw it at that time. The court accepted the withdrawal.

¶4 Bench trial began nine days later with the initial focus on whether a guardian was still needed. That hearing then segued into the commitment trial itself. At the conclusion of trial, the judge found that Mr. Reyes was an SVP and ordered him committed to the SCC.

¶5 Mr. Reyes timely appealed to this court. His brief challenged the sufficiency of the evidence to support the SVP determination and the "closure" of the courtroom at the pretrial hearing on his motion to dismiss. This court stayed the appeal pending the outcome of *State v. Wise*, 176 Wn.2d 1, 288 P.3d 1113 (2012). After the mandate issued in *Wise*, this court requested supplemental briefing from the parties and then heard oral argument.

## ANALYSIS

¶6 We first consider Mr. Reyes's argument that hearing the pretrial motion in the court's chambers constituted a courtroom closure in violation of art. I, § 10 of the Washington Constitution. His evidentiary sufficiency claim will be addressed in the unpublished portion of this opinion.

¶7 The closure argument requires us to address the history of art. I, § 10 to ascertain its meaning and applica-

---

[2] It is unclear from the record whether Mr. Reyes was present, although there is no reference to him at the hearing.

tion to this civil case. That inquiry looks at the language chosen by our constitution's framers and its historical antecedents, as well as interpretation of that provision over the years.[3] We then consider the meaning of the provision in light of this history before turning to the question of standing.

### Language and Historical Antecedents

¶8 Art. I, § 10 was adopted during our 1889 constitutional convention and approved by the voters later that year. Then, as now, the provision read:

> **SECTION 10 ADMINISTRATION OF JUSTICE.** Justice in all cases shall be administered openly, and without unnecessary delay.

This provision is found in the first article of our constitution, the Declaration of Rights. Also found in that article is § 22, Rights of the Accused. In part, that provision states:

> **SECTION 22 RIGHTS OF THE ACCUSED.** In criminal prosecutions the accused shall have the right . . . to have a speedy public trial by an impartial jury of the county in which the offense is charged to have been committed . . . .

The noted language of this provision also was enacted in 1889 and was not changed when the provision was amended in 1922 to include a venue provision for offenses committed in transit. *See* amend. 10, LAWS OF 1921, ch. 13, § 1.

¶9 There currently are 35 sections to article I, which is the first of what currently are 32 articles in the constitution. The provisions of article I detail individual rights, limitations on government power, and the people's political

---

[3] To save space this historical review addresses solely Washington Supreme Court decisions relating to § 10 and § 22. We are quite aware of the United States Supreme Court decisions involving First and Sixth Amendment access to the courts, and the numerous well-reasoned opinions of the Court of Appeals applying the Washington constitutional provisions, but only a few of the most factually relevant of these cases will be addressed later in this opinion. Enough trees will die as is.

authority including the right to recall officials. The very first section declares:

> **SECTION 1 POLITICAL POWER.** All political power is inherent in the people, and governments derive their just powers from the consent of the governed, and are established to protect and maintain individual rights.

¶10 The constitution's remaining articles address the branches of government and varying topics from elections and education to compensation of state and public officers. Article XXXI, which guarantees equality for the sexes, is the only other article to address the rights of individuals.

¶11 The framers drew upon the constitutions of Indiana and Oregon for the text of art. I, § 10. THE JOURNAL OF THE WASHINGTON STATE CONSTITUTIONAL CONVENTION 1889, at 499 n.18 (Beverly Paulik Rosenow ed., 1962) (hereinafter Rosenow). Washington considered, but rejected, en toto adoption of Oregon's provision. It read:

> No court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay, and every man shall have remedy by due course of law for injury done him in his person, property, or reputation.

OR. CONST. art. I, § 10 (1857); Rosenow, *supra*, at 499. The Oregon Constitution was the first to require that "justice be administered openly," a phrase that Washington adopted in art. I, § 10 as "Justice in all cases shall be administered openly."[4] There is no Oregon constitutional history that explains the change from "open courts" to the open administration of justice. Claudia Burton & Andrew Grade, *A Legislative History of the Oregon Constitution of 1857–Part I (Articles I & II)*, 37 WILLAMETTE L. REV. 469, 516 (2001).

¶12 The Oregon provision, in turn, was modeled after Indiana's 1851 Constitution. *Oregonian Pub. Co. v. O'Leary*, 303 Or. 297, 302 n.3, 736 P.2d 173 (1987) ("Nearly identical

---

[4] The Arizona Constitution subsequently adopted Washington's art. I, § 10 verbatim. *See* ARIZ. CONST. art. 2, § 11 (1912).

language found its way into Article I, section 12, of the Indiana Constitution of 1851, on which Article I, section 10, of the Oregon Constitution was based." (citing W.C. Palmer, *The Sources of the Oregon Constitution*, 5 Or. L. Rev. 200, 201 (1926))).

¶13 The Indiana provision had read:

All courts shall be open; and every man, for injury done to him in his person, property, or reputation, shall have remedy by due course of law. Justice shall be administered freely, and without purchase; completely, and without denial; speedily, and without delay.

Ind. Const. art. I, § 12 (1851).

¶14 It is possible to trace the "open courts" language to the early English common law following the Magna Carta. The 1851 Indiana provision is nearly identical to that found in the 1816 Indiana Constitution.[5] Indiana's 1816 Constitution was in turn based on the constitutions of Ohio, Kentucky, Pennsylvania, and Tennessee. John D. Barnhart, *Sources of Indiana's First Constitution*, 39 Ind. Mag. Hist. 55, 55 (1943).

¶15 Indiana's 1816 open courts provision is an exact copy of Ohio's 1802 provision. Ohio Const. art. VIII, § 7 (1802).[6] It also is almost indistinguishable from the constitutions of Kentucky[7] and Tennessee[8] that were in effect at that time. The only difference is that Kentucky and Tennessee included the word "purchase" in front of the phrase "denial or delay."

¶16 The Ohio, Kentucky, and Tennessee Constitutions had their foundation in Pennsylvania's Constitutions of

---

[5] "That all Courts shall be open, and every person, for an injury done him, in his lands, goods, person, or reputation shall have remedy by the due course of law; and right and justice administered without denial or delay." Ind. Const. art. I, § 11 (1816).

[6] This is currently found as amended in art. I, § 16 of the Ohio Constitution.

[7] Ky. Const. art. X, § 13 (1799).

[8] Tenn. Const. art. XI, § 17 (1796).

1776 and 1790. *See State v. Wyant*, 68 Ohio St. 3d 162, 168, 1994-Ohio-480, 624 N.E.2d 722; William C. Koch, Jr., *Reopening Tennessee's Open Courts Clause: A Historical Reconsideration of Article I, Section 17 of the Tennessee Constitution*, 27 U. Mem. L. Rev. 333, 368, 386 (1997). Most constitutions in the late 18th century were patterned on Pennsylvania's and Massachusetts's. Koch, *supra*, at 368. The former contained an open courts provision, while the latter did not. *Id.*

¶17 Pennsylvania's original open courts provision read:

Courts of sessions, common pleas, and orphans courts shall be held quarterly in each city and county; and the legislature shall have power to establish all such other courts as they may judge for the good of the inhabitants of the state. **All courts shall be open, and justice shall be impartially administered without corruption or unnecessary delay**: All their officers shall be paid an adequate but moderate compensation for their services: And if any officer shall take greater or other fees than the law allows him, either directly or indirectly, it shall ever after disqualify him from holding any office in this state.

Pa. Const. § 26 (1776) (emphasis added).

¶18 Prior to statehood, Pennsylvania had a history of constitutionalism dating back to William Penn's founding of the colony in the 1600s. Article V of Penn's Laws Agreed Upon in England read: "That all courts shall be open, and justice shall neither be sold, denied nor delayed." William Penn, Laws Agreed Upon in England, etc. (1682), *reprinted in* 5 The Federal and State Constitutions, Colonial Charters, and Other Organic Laws of the States, Territories, and Colonies 3060 (Francis Newton Thorpe ed., 1909).

¶19 Most cases and law review articles cite Penn's Laws Agreed Upon in England as America's first open courts provision. This is likely because it is the first American document to state that "justice shall neither be sold, denied nor delayed." This language in turn has its origin in Chapter 40 of Magna Carta (1215), which read: "To no one

will we sell, to no one will we deny or delay right or justice." Notably, the Magna Carta does not use the word "open."

¶20 Article V of Penn's Laws Agreed Upon in England actually appears to be a philosophical refinement on an earlier American document of which Penn was also a principal architect—the 1677 Concessions and Agreements of West New Jersey. Chapter XXIII of the 1677 Concessions and Agreements of West New Jersey stated:

"That in all publick courts of justice for tryals of causes, civil or criminal, any person or persons, inhabitants of the said Province may freely come into, and attend the said courts, and hear and be present, at all or any such tryals as shall be there had or passed, that justice may not be done in a corner nor in any covert manner."

*Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 567, 100 S. Ct. 2814, 65 L. Ed. 2d 973 (1980) (quoting Concessions and Agreements of West New Jersey (1677), ch. XXIII, *reprinted in* SOURCES OF OUR LIBERTIES 188 (Richard L. Perry ed., 1959)). This is the earliest and clearest endorsement of open courts in America. It also specifies that both civil and criminal trials are open to the public.

¶21 William Penn's legal philosophy was heavily influenced by Edward Coke and his commentaries on Magna Carta and other English laws. Koch, *supra,* at 364. It is in Coke's writings that the open courts provision has been traced to its earliest point. Coke's commentary on the first chapter of the 1267 Statute of Marlborough read:

"These words are of great importance, for all Causes ought to be heard, ordered, and determined before the Judges of the Kings Courts openly in the Kings Courts, whither all persons may resort; and in no chambers, or other private places: for the Judges are not Judges of chambers, but of Courts, and therefore in open Court, where the parties Councel and Attorneys attend, ought orders, rules, awards, and Judgments to be made and given, and not in chambers or other private places .... Nay, that Judge that ordereth or ruleth a Cause in his chamber, though his order or rule be just, yet offendeth he the Law, (as here it appeareth) because he doth it not in Court."

830

*Gannett Co. v. DePasquale*, 443 U.S. 368, 420 n.5, 99 S. Ct. 2898, 61 L. Ed. 2d 608 (1979) (alteration in original) (quoting 2 EDWARD COKE, INSTITUTES OF THE LAWS OF ENGLAND 103 (6th ed. 1681));[9] *see also Richmond Newspapers, Inc.*, 448 U.S. at 565 n.6 (plurality opinion) (discussing Coke's interpretation of the Statute of Marlborough).

¶22 Thus, it appears that the word "open" in America's open courts provisions originated in Coke's commentary on chapter 1 of the Statute of Marlborough and was later shortened and grafted onto Penn's transplant of Magna Carta's chapter 40. While Washington retained the "open" part of this history, it applied that language to the administration of justice rather than to simply the courtroom.

¶23 The open courts doctrine has its foundation in the Magna Carta and in the view of that document by early legal commentators. No history exists that suggests whether or not the change made by the Oregon and Washington Constitutions from open courts to open administration of justice was meant to vary from the original model. The textual language suggests that Washington should provide even greater "openness" in judicial proceedings than was available under the traditional language. We conclude that the requirement that justice be openly administered includes, at a minimum, the long recognized right of the public to attend court proceedings. The provision is not expressed as an individual right, but as a command to the judiciary. In our view, the text and history of this provision compels the conclusion that § 10 creates a right held by all Washingtonians.

*Power of Judges at Chambers*

¶24 The Washington Constitution also adopted a provision in 1889 that is relevant to the interpretation of art. I, § 10. It is art. IV, § 23.

---

[9] Coke's commentary is to the earlier quoted section from the 1267 Statute of Marlborough.

¶25 Section 23 provides for superior court commissioners and explains their authority in this manner:

> **SECTION 23 COURT COMMISSIONERS.** There may be appointed in each county, by the judge of the superior court having jurisdiction therein, one or more court commissioners, not exceeding three in number, **who shall have authority to perform like duties as a judge of the superior court at chambers**, subject to revision by such judge, to take depositions and to **perform such other business connected with the administration of justice** as may be prescribed by law.

(Emphasis added.)

¶26 The meaning of the phrase "at chambers" under our constitution has had a somewhat turbulent history in Washington. When it first tackled the question of defining judges' powers at chambers under this provision, the Washington Supreme Court adopted the definition from the territorial statutes. *Peterson v. Dillon*, 27 Wash. 78, 84, 67 P. 397 (1901). It did so in the belief that these were the powers that the framers were familiar with and thus had in mind when the constitution was enacted. *Id.* at 83-84. The Territorial Code of 1881, cited in *Peterson*, stated that judges at chambers may "entertain, try, hear, and determine all actions, causes, motions, demurrers, and other matters not requiring a trial by jury." CODE OF 1881, § 2138.[10] The commissioner sitting in *Peterson* had entered an order of default in chambers and later tried the case in chambers and entered judgment in favor of the plaintiff for damages, costs, and fees. *Peterson*, 27 Wash. at 81.

¶27 A few years later, the Supreme Court overturned *Peterson* and held that art. IV, § 23 should be interpreted by reference to judges' current powers at chambers rather than the powers that existed at the time of the constitutional convention. *State v. Philip*, 44 Wash. 615, 617, 87 P.

---

[10] Authority under this statute later was described as the power to act at any time. *Kalb v. German Sav. & Loan Soc'y*, 25 Wash. 349, 65 P. 559 (1901) (territorial judge had authority to try quiet title action in chambers).

955 (1906) ("[W]e cannot believe that the framers of the constitution intended to define the powers of important judicial officers by reference to the legislation of a government which was about to pass out of existence forever."). The court then quoted Laws of 1891, ch. 54, § 1, as the guiding statute for identifying judges' powers at chambers. *Id.* This statute remains unchanged and in effect today, and reads: "A judge may exercise out of court all the powers expressly conferred upon a judge as contradistinguished from a court and not otherwise." RCW 2.28.050.

¶28 The Supreme Court two years later called *Philip* into doubt by suggesting that perhaps superior court judges have no powers at chambers whatsoever, implying that RCW 2.28.050 was an empty enactment. *See Howard v. Hanson*, 49 Wash. 314, 318, 95 P. 265 (1908). "What was intended by the constitution makers to be included in the first of these grants of power is not clear, as they had in a prior section of the constitution provided that the superior courts should always be open for the transaction of business, and thus eliminated the distinction that formerly existed between the powers of a judge during term time and his powers after the adjournment of the term, doing away with the sittings of the court at chambers altogether." *Id.*[11]

¶29 However, when faced with the question of a judge's powers at chambers the following year, the court stated: "[I]t cannot be successfully contended that an act done by a judge sitting on the bench where no jury is required has any greater legal force than the same act done by him in an adjoining room by courtesy styled his chambers."

---

[11] The *Philip* court had believed that there was a need for judges to have some powers at chambers. *Philip* reasoned as follows:

> There may be little necessity for conferring any considerable power on a judge at chambers, when the court over which he presides is always open, yet the fact that a court is always open is not necessarily incompatible with the exercise of certain judicial functions by the judge of that court at chambers; at least the framers of the constitution did not so consider it. Nor has the legislature [, which enacted RCW 2.28.050].

*Philip*, 44 Wash. at 617.

*Meisenheimer v. Meisenheimer,* 55 Wash. 32, 42-43, 104 P. 159 (1909).

¶30 Almost 20 years later, the interpretation did change again when the Supreme Court overturned *Philip,* reinstated *Peterson,* and held that art. IV, § 23 should be interpreted by reference to judges' powers at chambers as they existed at the time of the constitutional convention. *State v. Claypool,* 132 Wash. 374, 377, 232 P. 351 (1925). The court reasoned that "[i]f a court commissioner does not have the powers as they existed at the time of the adoption of the constitution, it is difficult to see just what the framers thereof had in mind when they provided that he should have such powers as a court at chambers, since in the other provision of the constitution [art. IV, § 6] they had provided that the court should always be open." *Id.*

¶31 This period of history suggests that our court was caught up in the historic battle that raged in Coke's day. Our court began, and ended, this period with the view that the constitution preserved the common law chambers power as modified by legislation. For a few years, the court turned to the view of Lord Coke that a judge could act only in court or not at all.

¶32 Judges' powers at chambers were originally derived from the common law. *See State v. Williams,* 341 Wis. 2d 191, 212 n.15, 814 N.W.2d 460 (2012).[12] The common law is subject to legislative modification, but it applies unless it is inconsistent with the constitution and laws of Washington. RCW 4.04.010.

¶33 Art. IV, § 23 appears to have its origins in the constitutions of California,[13] Wisconsin,[14] and Minnesota.[15]

---

[12] For a history on how the term "at chambers" and the powers that went with it developed, see *Von Schmidt v. Widber,* 99 Cal. 511, 512-14, 34 P. 109 (1893).

[13] Cal. Const. art. VI, § 14 (1879).

[14] Wis. Const. art. VII, § 23 (1848).

[15] Minn. Const. art. VI, § 15 (1857).

Rosenow, *supra*, at 626 n.53. The Wisconsin Supreme Court early in that state's history held that the power of judges at chambers "was subject to legislative modification." *Williams*, 341 Wis. 2d at 211 (discussing *In re Remington*, 7 Wis. 643, 652-55 (1858)). In California and Minnesota, the constitutional chambers powers of its commissioners are also determined with reference to the statutory powers of regular judges at chambers. *Estate of Roberts*, 49 Cal. App. 2d 71, 76-77, 120 P.2d 933 (1942); *Hoskins v. Baxter*, 64 Minn. 226, 229-30, 66 N.W. 969 (1896).

¶34 Washington's definition of this power by legislation is consistent with the 19th century practices in other states with similar constitutional provisions. Several Washington statutes followed the lead of RCW 2.28.050 in distinguishing between a judge's powers and the court's powers. *See, e.g.*, RCW 2.08.190, .200.

¶35 Washington thus recognized at the time of adopting its constitution that judges had authority to conduct business, other than trial, outside of the public courtroom. However, that authority was still subject to the command that it be "administered openly." Since the same constitutional convention produced both provisions, the constitution appears to envision that judges can perform their activities "openly" without all activities taking place in public.

*Art. I, § 10 in the Courts*

¶36 The explosion of litigation raising art. I, §§ 10 and 22 issues in the last several years makes any attempt at a comprehensive review out of date before the opinion even issues. Nonetheless, we believe that some historic review of the case law is in order to attempt to give meaning to the open administration of justice language of § 10.[16]

---

[16] It appears the first case law mention of the provision is found in a case construing the constitutional limitations of a county's indebtedness and its ability to pay its court debts. *Rauch v. Chapman*, 16 Wash. 568, 48 P. 253 (1897). There the

¶37 The first mention of the § 10 open justice right came in a criminal case, *State v. Gaines*, 144 Wash. 446, 258 P. 508 (1927). There the trial court indicated that it would close the courtroom the next day during expected testimony about the incestuous relationship between the defendant and his murdered daughter. The Washington Supreme Court declined to consider the issue as there was no evidence the courtroom ever closed but indicated that it would have presented a serious issue under both §§ 10 and 22 of art. I. *Id.* at 462. The court also noted that both sections guaranteed a criminal defendant a public trial. *Id.*

¶38 Criminal prosecutions also were at issue in the next cases to mention § 10. In one case, the court locked the door during the prosecutor's closing argument in order to avoid disruption. *State v. Collins*, 50 Wn.2d 740, 314 P.2d 660 (1957). As there was no objection by the defense and there were members of the public present, the court found no prejudicial error that deprived the defendant of his art. I, § 10 and § 22[17] public trial rights. *Id.* at 745-48. A challenge to the closure of a juvenile court trial was at issue in *In re Lewis*, 51 Wn.2d 193, 316 P.2d 907 (1957). The court rejected an art. I, § 10 challenge to former RCW 13.04.090, *repealed by* Laws of 1961, ch. 302 § 17, which had permitted the trial court to close juvenile delinquency proceedings. *Id.* at 197-200.

¶39 The next series of cases raising § 10 open justice issues involved press reporting of criminal trials. The first of these is *State ex rel. Superior Court v. Sperry*, 79 Wn.2d 69, 483 P.2d 608 (1971). There the superior court had found two reporters in contempt for reporting the results of a suppression hearing that had resulted in the exclusion of some evidence at trial. The contempt ruling was reversed on

court recognized that the constitutional obligation to provide justice "without unnecessary delay" was a mandatory duty of the county. *Id.* at 575.

[17] This provision was referred to as the "tenth amendment" in *Collins*. 50 Wn.2d at 745. The tenth amendment to the Washington Constitution amended § 22 to add the venue provision for crimes committed in transit.

the authority of the First Amendment to the United States Constitution and art. I, § 10. *Id.* at 75-78.

¶40 An order barring the press and public from a pretrial suppression hearing was upheld against an art. I, § 10 challenge in *Federated Publications, Inc. v. Kurtz*, 94 Wn.2d 51, 615 P.2d 440 (1980). There the trial court had closed the courtroom for the hearing after the appellant newspaper had previously published damaging evidence that resulted in a change of venue. Noting the conflict between the defendant's right to a fair trial guaranteed by art. I, § 22 and the public's right to access the criminal trial guaranteed by § 10, the court for the first time applied the five factor balancing test suggested by the concurring opinion of Justice Powell in *DePasquale*, 443 U.S. at 400-01. *Kurtz*, 94 Wn.2d at 62-64. The court also explicitly recognized that the § 22 right did not apply to the public. *Id.* at 59.

¶41 The five factor test was refined and applied to another art. I, § 10 claim in *Seattle Times Co. v. Ishikawa*, 97 Wn.2d 30, 37-39, 640 P.2d 716 (1982). There the trial court had closed a pretrial motion to dismiss a murder prosecution and declined to release a transcript of the proceedings even after the murder trial had ended. Based on the lack of an adequate record to determine that the closure was justified, the court remanded for the trial judge to determine if the sealing was still necessary. *Id.* at 45.

¶42 *Seattle Times Co. v. Eberharter*, 105 Wn.2d 144, 713 P.2d 710 (1986), involved a petition by a newspaper for a writ of mandamus to compel disclosure of a search warrant affidavit. The court concluded that art. I, § 10 did not extend to investigatory process and was not applicable before charges had been filed. *Id.* at 155-57. The court also cited *Ishikawa* for the proposition that art. I, § 10 provided "a right of access to (1) trials, (2) pretrial hearings, (3) transcripts of pretrial hearings or trials, and (4) exhibits introduced at pretrial hearings or trials." *Id.* at 155.

¶43 Section 10 was used to invalidate a statute that protected the names and identifying information of child

sexual assault victims in *Allied Daily Newspapers of Washington v. Eikenberry*, 121 Wn.2d 205, 848 P.2d 1258 (1993). The court concluded that § 10 required that the *Ishikawa* factors be applied on an individualized basis each time a court closure is considered. By imposing a blanket closure of the identifying information, the statute ran afoul of the constitutional provision. *Id.* at 209-12.

¶44 The related issue of press or public access to closed portions of a public record also presents § 10 issues. The first of those cases was *Cohen v. Everett City Council*, 85 Wn.2d 385, 535 P.2d 801 (1975). That case involved a writ of certiorari to superior court from a license revocation action by a city council that heard the matter in a closed session at the request of the licensee. The licensee then had the hearing record sealed except for use by the trial judge. The local newspaper was allowed to intervene and sought to set aside the confidentiality order that had sealed the record. *Id.* at 386. The Washington Supreme Court held that art. I, § 10 guaranteed a public trial in civil cases. *Id.* at 388-89. It went on to reverse the sealing order, reasoning that the hearing record would be the testimony before the superior court and therefore "became public property" that would be made part of the public record. *Id.* at 389.

*Modern Cases*

¶45 The modern explosion of cases traces to *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995). There the court dealt with a criminal prosecution that had seen a closed pretrial hearing designed to protect an undercover officer's identity. The court concluded that the *Ishikawa* standards used in § 10 cases were required to be applied in criminal cases governed by § 22 since the two sections served complementary functions. *Id.* at 259.

¶46 The large number of § 22 criminal cases resulted in numerous opportunities to apply the *Ishikawa* standards across a variety of fact patterns. Those analyses would inform civil cases raising solely § 10 arguments just as the

§ 10 cases informed many criminal cases. *E.g., State v. Sublett*, 176 Wn.2d 58, 292 P.3d 715 (2012) (adopting "experience and logic test" for determining whether courtroom was closed); *State v. Strode*, 167 Wn.2d 222, 217 P.3d 310 (2009) (in chambers voir dire); *State v. Momah*, 167 Wn.2d 140, 217 P.3d 321 (2009) (no structural error when defendant joined in closing courtroom during voir dire).

¶47 The court has found the purpose of the open courtroom provisions of § 22 and the Sixth Amendment to the United States Constitution are

> to ensure a fair trial, to remind the officers of the court of the importance of their functions, to encourage witnesses to come forward, and to discourage perjury.

*State v. Brightman*, 155 Wn.2d 506, 514, 122 P.3d 150 (2005).

¶48 Applying the *Ishikawa* standards, the court concluded that closure of a pretrial hearing at one criminal codefendant's request violated the other codefendant's right to a public trial under § 22 in *State v. Easterling*, 157 Wn.2d 167, 137 P.3d 825 (2006). The court also noted that the public's rights under § 10 were violated when the court cleared the spectators from the courtroom. *Id.* at 179-80.

¶49 The contours of the open administration of justice provision outside of the trial context also have come into clearer focus. One criminal case presenting such an issue was *State v. Beskurt*, 176 Wn.2d 441, 293 P.3d 1159 (2013). There a criminal defendant challenged the sealing of juror questionnaires after jury selection. The court concluded that the defendant's § 22 rights were not violated.[18]

¶50 In several cases, our court has applied § 10 to analyzing whether or not documents created in civil litigation became part of the record either for disclosure or record sealing purposes. *Bennett v. Smith Bunday Berman Britton,*

---

[18] The lead opinion of four justices also rejected a Court of Appeals conclusion that § 10 had been violated. *Beskurt*, 176 Wn.2d at 448. Two other justices disagreed with the lead opinion's treatment of the issue but concurred in the result. *Id.* at 457-59. The remaining justices did not address the issue.

*PS*, 176 Wn.2d 303, 291 P.3d 886 (2013) (intervenor failed in attempt to unseal proprietary documents submitted to, but not considered by, the trial court); *State v. McEnroe*, 174 Wn.2d 795, 279 P.3d 861 (2012) (defendant allowed to withdraw documents after preliminary ruling; § 10 and GR 31 did not apply to documents not in court record); *Tacoma News, Inc. v. Cayce*, 172 Wn.2d 58, 256 P.3d 1179 (2011) (§ 10 did not grant press access to deposition taken in courtroom but not introduced at trial); *Rufer v. Abbott Labs.*, 154 Wn.2d 530, 114 P.3d 1182 (2005) (documents filed with trial court are presumptively open; § 10 required that sealing of materials submitted to trial court permissible only when compelling interests override public's interest in open administration of justice); *Dreiling v. Jain*, 151 Wn.2d 900, 93 P.3d 861 (2004) (newspaper intervened to challenge sealing ruling; court finds that motion to terminate derivative suit was equivalent of summary judgment and documents could not be sealed without showing of compelling need).[19]

¶51 Issues relating to courtroom closure also have continued to present questions regarding the scope of § 10. A closure issue was presented by operation of a court rule, MPR 1.3, in *In re Detention of D.F.F.*, 172 Wn.2d 37, 256 P.3d 357 (2011). There all nine justices agreed that the rule, which closed involuntary commitment proceedings unless the subject of the hearing requested that it be open, violated § 10. No opinion gathered a majority of the court, which fractured primarily on the remedy issue and how to approach it.

¶52 Several principles applicable to this case can be distilled from the case law. Because both use the same *Ishikawa* analysis, § 22 case authority can be useful in analyzing open justice issues presented in a civil case, but

---

[19] Access to court documents is also litigated in other manners, including the use of GR 31; the Public Records Act, ch. 42.56 RCW; and the common law right of access to the courts. *See generally City of Federal Way v. Koenig*, 167 Wn.2d 341, 217 P.3d 1172 (2009).

that provision is limited to criminal cases and does not apply in a civil action. *Kurtz*, 94 Wn.2d 51. There is a § 10 right to a public trial in civil cases. *Cohen*, 85 Wn.2d 385. The § 10 right to public access is not limited solely to open courtrooms but also applies in some circumstances to documents filed with the court. *E.g.*, *Rufer*, 154 Wn.2d 530; *Cohen*, 85 Wn.2d 385. The press many times has asserted § 10 to view proceedings or filings in both criminal and civil cases. *E.g.*, *Ishikawa*, 97 Wn.2d 30; *Dreiling*, 151 Wn.2d 900. Other members of the public have also asserted their right of access under § 10. *Bennett*, 176 Wn.2d 303.

### Appellant's Contentions

¶53 After this overly long review of history, it is finally time to address Mr. Reyes's specific arguments. He claims that the court erred in "closing" his motion hearing without first applying the *Ishikawa* factors to the closure. He asserts this argument on his own behalf as well as that of the public at large. His arguments require us to address whether or not § 10 applied to his hearing, whether we can review his personal claim in this proceeding, and his standing to assert the argument on behalf of others.[20]

¶54 We address the noted issues in the order stated.

### § 10 Applied to a Pretrial Hearing in Civil Case

¶55 The initial issue presented is whether or not the motion to dismiss needed to be heard in open court. This is a close issue, but we conclude that because the court heard argument in the case, it was required to conduct a public hearing.

¶56 Two constitutional provisions arguably conflict in this case. The judge's constitutional authority to decide matters at chambers appears to extend to pretrial hearings

---

[20] In light of our resolution of these claims, we specifically do not decide what the appropriate remedy for a § 10 violation would have been under the facts of this case. Because of the chambers power, it is unclear that the remedies for a § 22 violation apply to a § 10 violation.

since the judge (or commissioner) could try all nonjury matters in chambers. *Peterson*, 27 Wash. at 81 (commissioner entered default in chambers and later tried case in chambers to enter amount of default judgment); *Kalb v. German Sav. & Loan Soc'y*, 25 Wash. 349, 358, 65 P. 559 (1901) (territorial judge had authority to try quiet title action in chambers). We know of no authority that required the trial court to hear argument on this motion, which could have been decided in chambers on the basis of the motion pleadings since no testimony was taken. These reasons suggest that the matter need not have been decided at a public hearing.

¶57 In contrast, the open courtroom mandate has clearly been applied to pretrial hearings in criminal cases. *Easterling*, 157 Wn.2d 167; *Bone-Club*, 128 Wn.2d 254. It also applies to materials filed in support of motions to dispose of a civil case. *Dreiling*, 151 Wn.2d 900 (motion to terminate shareholder derivative suit). We have little doubt that if the court had heard evidence in support of the motion to dismiss this case that § 10 would have required that it be heard in the public courtroom. Some of the purposes of the open courtroom requirement are "to encourage witnesses to come forward, and to discourage perjury." *Brightman*, 155 Wn.2d at 514. Those purposes are just as important in civil litigation as in criminal litigation, and we believe § 10 shares those same purposes with § 22.

¶58 However, it is the nature of the hearing, not whether or not evidence is taken, that determines whether an open hearing is required.[21] If, as *Dreiling* held, the materials supporting a dispositive motion must be open to the public, then certainly the motion hearing itself had to be open. We hold that when a dispositive motion is *argued* to the court in a civil case, it should be heard in the courtroom or other facility open to the public. Any waiver of the public

---

[21] Similarly, a hearing is still a hearing no matter where or how it is heard. The right to a public hearing is not dependent upon the technology in use or the courtroom's ability to field that technology. Thus, it may be difficult to move many modern communication methods into the public arena, but that will be necessary if they are to be employed for hearings or trial.

forum will have to take place in the courtroom in accordance with the *Ishikawa* guidelines.

¶59 It was error to hear the motion in chambers. However, that does not necessarily mean that Mr. Reyes is entitled to relief. He did not assert his right to have the hearing in public and that fact weighs heavily in our discussion of the next issue.

### Manifest Constitutional Error

■ ¶60 The general rule in Washington is that an appellate court will not consider an issue on appeal which was not first presented to the trial court. RAP 2.5(a); *State v. Scott*, 110 Wn.2d 682, 685, 757 P.2d 492 (1988). However, RAP 2.5(a)(3) permits a party to raise initially on appeal a claim of "manifest error affecting a constitutional right." The error must be both (1) manifest and (2) truly of constitutional magnitude. *Scott*, 110 Wn.2d at 688. It is "manifest" if either (1) it "results in actual prejudice to the defendant," or (2) the party has made a " 'plausible showing' " that the error had " 'practical and identifiable consequences' " to the trial. *State v. WWJ Corp.*, 138 Wn.2d 595, 602-03, 980 P.2d 1257 (1999) (quoting *State v. Lynn*, 67 Wn. App. 339, 345, 835 P.2d 251 (1992)).

■ ¶61 RAP 2.5(a) "makes no distinction between civil and criminal cases. . . . We have recognized that civil parties may raise constitutional issues on appeal if they satisfy the criteria listed in RAP 2.5(a)(3)." *Id.* at 601. As a member of the public, Mr. Reyes had the right to a public hearing under § 10; his alleged error is of constitutional magnitude. *In re Dependency of J.A.F.*, 168 Wn. App. 653, 662, 278 P.3d 673 (2012); *In re Det. of Ticeson*, 159 Wn. App. 374, 382, 246 P.3d 550 (2011).

¶62 That does not mean he has satisfied the "manifest" prong of the rule. *J.A.F.*, 168 Wn. App. at 662; *Ticeson*, 159 Wn. App. at 383. It is still his burden, since he did not object in the trial court, to establish either actual prejudice or a plausible theory of how he was harmed by the closure of the

hearing on his motion to dismiss. *Ticeson*, 159 Wn. App. at 383. He has made no attempt to meet his burden on appeal and fails to articulate any theory of why his motion to dismiss would have been treated differently if argued in public.[22]

¶63 Instead, as in *J.A.F.* and *Ticeson*, Mr. Reyes argues that the presumption of prejudice applied in § 22 criminal cases should apply to his case. We agree with those courts that it does not. *J.A.F.*, 168 Wn. App. at 662; *Ticeson*, 159 Wn. App. at 383. Washington typically treats the erroneous closure of a criminal case as a form of structural error. *E.g.*, *Wise*, 176 Wn.2d at 14-15, 18-19. *But see Momah*, 167 Wn.2d 140 (not structural error where defense participated in closing courtroom). The doctrine of structural error has never yet been applied to a civil case.[23] That is unsurprising since the doctrine was designed to address errors that "deprive defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence.' " *Neder v. United States*, 527 U.S. 1, 8-9, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999) (quoting *Rose v. Clark*, 478 U.S. 570, 577-78, 106 S. Ct. 3101, 92 L. Ed. 2d 460 (1986)). A majority of the Washington Supreme Court rejected the argument that structural error applied to a civil proceeding in *D.F.F.* 172 Wn.2d at 48 (J.M. Johnson, J. concurring), 52-57 (Madsen, C.J., dissenting).

¶64 Following *J.A.F.* and *Ticeson*, as well as the majority of the court in *D.F.F.*, we conclude that structural error does not apply to a violation of § 10 in a civil case.

---

[22] He does not assign error to the denial of his motion to dismiss nor otherwise argue in this appeal that the trial court erred.

[23] Wrongful deprivation of counsel in a criminal case is recognized as structural error. *Neder v. United States*, 527 U.S. 1, 8, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999) (citing *Gideon v. Wainright*, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963)). In an earlier SVP case, the denial of counsel was treated by the plurality opinion as a question of harmless error. *In re Det. of Kistenmacher*, 163 Wn.2d 166, 174, 178 P.3d 949 (2008). Only the dissenting opinion of Justice Sanders considered the issue structural error. *Id.* at 185-86 (Sanders, J., concurring in part, dissenting in part).

¶65 *Ticeson* pointed out another reason why the public trial right should be asserted in the trial court. Many fundamental criminal rights, including those guaranteed by § 22, can only be waived in a knowing, intelligent, and voluntary manner.[24] That is, the court must determine that the defendant knew the right existed and was knowingly waiving it. *Ticeson*, 159 Wn. App. at 383. That standard, however, is problematic when applied to § 10:

> But if the same test applies to Section 10 rights, the court would be required to ensure, sua sponte, that all parties (and possibly, everyone in the courtroom), know about and waive any rights under Section 10. Otherwise, the losing party may raise the issue for the first time on appeal, and the only remedy is reversal. This is an unjust and costly proposition and the rule does not permit it. A party who perceives a possible violation of Section 10 must make its argument to the trial judge, thereby ensuring a record for review.

*Id.* We agree.

¶66 Another cause for concern is that under *Momah*, not even all § 22 closures necessarily are structural error. It is difficult, therefore, to conclude that § 10 violations would necessarily have to be structural error.

¶67 For all of these reasons, we conclude that Mr. Reyes has not established that the § 10 error was manifest and he cannot raise that claim in this appeal. We therefore turn to his claim that the public's rights were violated independent of his own right.

### Assertion of Public's Rights under § 10

¶68 Apart from his own right under § 10, Mr. Reyes argues that the rest of the public also had a right to attend the hearing and that he can assert that right for the first time in this appeal. We conclude that he lacks standing under the settled standards that govern third party standing in Washington.

---

[24] There are other constitutional rights that are waived unless asserted. *See, e.g., Strode*, 167 Wn.2d at 235 (Fairhurst, J., concurring).

¶69 In both civil and criminal actions, Washington applies the standing test used by the United States Supreme Court. *T.S. v. Boy Scouts of Am.*, 157 Wn.2d 416, 424 n.6, 138 P.3d 1053 (2006) (citing *Mearns v. Scharbach*, 103 Wn. App. 498, 512, 12 P.3d 1048 (2000)); *State v. Burch*, 65 Wn. App. 828, 837, 830 P.2d 357 (1992).

> In the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties. . . . We have recognized the right of litigants to bring actions on behalf of third parties, provided three important criteria are satisfied: The litigant must have suffered an "injury in fact," thus giving him or her a "sufficiently concrete interest" in the outcome of the issue dispute, the litigant must have a close relation to the third party, and there must exist some hindrance to the third party's ability to protect his or her own interests.

*Powers v. Ohio*, 499 U.S. 400, 410-11, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991) (citations omitted) (quoting *Singleton v. Wulff*, 428 U.S. 106, 112, 96 S. Ct. 2868, 49 L. Ed. 2d 826 (1976)).

¶70 Mr. Reyes fails to satisfy any of these requirements, let alone all of them. First, he makes no showing of "injury in fact." Indeed, if he had been able to do so, he would have satisfied RAP 2.5(a)(3) and we would have heard his claim directly. Second, Mr. Reyes has no close relationship to the general public. While it is his own standing as a member of the public that gave him the right to assert a § 10 claim, he has no more special interest to the rest of the public than anyone else.

¶71 Finally, there was no impediment to the public asserting its rights that would have justified Mr. Reyes asserting the public's rights. The history of § 10 litigation in this state shows that the press has regularly asserted its open administration of justice right in both criminal and civil cases. *E.g., Ishikawa*, 97 Wn.2d 30; *Dreiling*, 151 Wn.2d 900. Private citizens likewise have asserted the right. *Bennett*, 176 Wn.2d 303. Nothing in the record of this case

suggests that the public's ability to assert itself into the pretrial hearing was hindered in some manner. Mr. Reyes has not established that he should have third party standing to assert the § 10 argument apart from his own right to do so.

¶72 Mr. Reyes does argue that the issue was decided in his favor in *D.F.F.* It was not. First, the lead opinion that found standing spoke only for four members of the court. Second, the discussion in *D.F.F.* was aimed at rejecting the State's argument that the appellant's sole right under § 10 was to be present for her own civil commitment trial. *D.F.F.,* 172 Wn.2d at 39. Instead, the court reasoned that appellant's rights under § 10 extended to having the public attend her commitment hearing. *Id.* at 39-41. The appellant in *D.F.F.* did not argue, and the court did not address, whether the appellant independently could assert the public's own right to attend the hearing. It simply was not in issue.

¶73 *D.F.F.* does, however, help explain the contours of the § 10 right in the context of trial (and other open hearing) proceedings. The public has a right to attend. The litigant has the right to attend for the same reason—as a member of the public (since, unlike the criminal defendant, there is no specific constitutional provision declaring a litigant's individual right to a public civil trial). Concomitant with the general right to attend held by everyone, the litigant's attendance right necessarily recognizes that others can be present as well.

¶74 Policy reasons, which were touched on in *Ticeson,* also compel the result reached by the standing discussion. The right to an open hearing recognized by § 10 is a general public right that a civil litigant shares with everyone. Since it is not a particularized individual right, the litigant who asserts the public's right to attend is asserting the very same right that ensures his public hearing. We see no policy reason for splitting § 10 into litigant and general public attendance rights. If a litigant declines, perhaps for tactical

reasons,[25] to assert his own right to a public hearing, we do not see why he should be allowed to assert someone else's right to attend. This essentially gives a litigant the ability to try the case in his preferred manner (without public scrutiny) but obtain a new trial if things do not go in his favor.[26]

¶75 We conclude that Mr. Reyes lacks standing to assert the right of others to have attended his hearing. We also can discern no valid interest in allowing a litigant to assert a right for others that he declined to assert for himself. For both reasons, Mr. Reyes cannot argue that the public was wrongly excluded from his motion hearing.

## CONCLUSION

¶76 In summation, we conclude that when a motion to dismiss a civil case is argued to the bench, it must be heard in public absent a waiver of the art. I, § 10 right of the public to be present. A civil litigant shares that right of a public hearing with the general public and has no special right as a litigant. The litigant who fails to assert the right to a public hearing must show how he was prejudiced by the closure. A litigant who did not assert his own right to a public hearing lacks standing to assert the public's right. For all of these reasons, we affirm the sexually violent predator determination.

¶77 Affirmed.

¶78 The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accor-

---

[25] Other SVP respondents have argued unsuccessfully that the court erred by failing to close proceedings. *E.g., In re Det. of Turay*, 139 Wn.2d 379, 413-15, 986 P.2d 790 (1999); *In re Det. of Campbell*, 139 Wn.2d 341, 355-56, 986 P.2d 771 (1999).

[26] This would be a dangerous approach to take. Since civil cases typically do not involve double jeopardy concerns, it also is possible that a successful litigant could have his trial victory unwound by the opposing side.

dance with the rules governing unpublished opinions. RCW 2.06.040.

BROWN and KULIK, JJ., concur.

Petition for review filed October 30, 2013.