IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 26354-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JERRY ALLEN HERRON, | ) | PUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

KORSMO, C.J. — Recognizing that he had already waived his own right to an open public trial under art. I, § 22 of the Washington Constitution, appellant Jerry Herron argues that he should be entitled to allege a violation of the public's open trial rights under art. I, § 10. We conclude that he lacks standing to challenge the private voir dire in chambers that he championed over his contrary right of public jury selection. His conviction for first degree rape is affirmed.

## FACTS

The charge arose after Mr. Herron raped an acquaintance at knifepoint in his car along the highway between Spokane and Pullman. He had agreed to give the young woman, K.B., a ride to Pullman from Airway Heights. K.B. was 22; Mr. Herron was 57.

Law enforcement arrested Mr. Herron the following day. After advice of rights, he agreed to talk to them "Until I don't want to." During the interview, Mr. Herron denied having sexual relations with K.B. He later answered a question "No. And if I am going to get charged I probably need an attorney. I didn't do it." Clerk's Papers (CP) at 49. After again denying having sexual relations with K.B., he stated, "If it goes farther than that we need to have an attorney or something. I don't know." CP at 57. He later terminated the interview. CP at 66.

Deoxyribonucleic acid (DNA) testing determined that Mr. Herron's semen was found in the victim and on some of her clothing. The case proceeded to jury trial in June 2007. The issue of jury selection was discussed at the initial readiness hearing in early June. The court indicated it would use a jury questionnaire to find sensitive information that might require individual questioning. Aware of recent cases concerning jury selection, the court noted that its former procedure of questioning jurors in chambers was in conflict with the defendant's right to jury selection in the courtroom. The judge told the defense it is "pretty much up to you" how the case would proceed. Report of Proceedings (RP) (June 8, 2007) at 72. The defendant personally assured the judge that he appreciated that "very much." RP (June 8, 2007) at 72.

The following week a pretrial hearing was held and the issue revisited. Defense counsel indicated he had discussed the matter with Mr. Herron, who was willing to waive

2

his right to a public trial in order to question potential jurors privately in chambers. The court then addressed Mr. Herron.

> THE COURT: All right. Mr. Herron, you understand you have a right to a public trial, where no one other than perhaps the witnesses are excluded from the courtroom, and where—when the jury questioning takes place, you have a right to have anybody that wants to be here present for that process. Do you understand that fully?
> DEFENDANT: Yes.
> THE COURT: And by the same token, if you want to waive that right so that jurors will know that if they respond positively to some of these questions about things like have they ever been accused of a sex offense or been a victim of a sex offense or an unwanted sexual touching, have a close friend or family member—we discussed last week, very often individuals are very reluctant to disclose those things, and particularly to disclose those things if they know they're going to be talked about in front of, well, for instance, 50 other jurors and other members of the public.
> DEFENDANT: Yes, sir.

RP (June 15, 2007) at 104-05.

Further questions ensued, with the defendant personally assuring the court that he wanted to give up his right to a public trial and have the jurors questioned privately in chambers. The prosecutor also presented other options such as questioning the jurors individually in public with the rest of the venire in another location. Mr. Herron assured the court that chambers questioning was his preferred approach. The court concluded that Mr. Herron knowingly and voluntarily waived his right to a public trial on this issue. RP (June 15, 2007) at 108-09.

Jury selection began three days later and proceeded according to the pretrial discussions. Jurors whose questionnaire answers suggested the need for private

3

interviews concerning such matters as prior sexual abuse were questioned in chambers by counsel in the defendant's presence. The jury heard the defendant's denial of sexual contact with the victim through the interviewing officer and also received the DNA test results. The jury concluded Mr. Herron was guilty of first degree rape while armed with a deadly weapon.

He timely appealed to this court, which stayed the matter after initial briefing to await the decision in *State v. Strode*, 167 Wn.2d 222, 217 P.3d 310 (2009). The matter was then scheduled for consideration by a panel without argument. That panel stayed the matter pending the outcome of *State v. Wise*, 176 Wn.2d 1, 288 P.3d 1113 (2012). After each stay was lifted, this court requested supplemental briefing from the parties. The matter ultimately proceeded to oral argument.

## ANALYSIS

This appeal raises issues concerning the voluntariness of the defendant's statement to law enforcement and the closure of a portion of the jury voir dire.[1] Both issues have been overtaken in some respects by intervening case authority. We will address them in the order they arose in the trial court.

---

[1] Mr. Herron has also filed a pro se statement of addition grounds (SAG). We find his two claims without merit and will not discuss them. However, we do note that fourth degree assault is not a lesser included offense of first degree rape. *See State v. Walden*, 67 Wn. App. 891, 893-94, 841 P.2d 81 (1992) (fourth degree assault not included offense of second degree rape).

*Defendant's Statement*

Mr. Herron initially argued in his original brief that he asserted his right to counsel during questioning and that the deputy sheriff therefore had a duty to clarify his desire and/or break off questioning. The authority on which he relied was overturned after his initial briefing to this court.

When conducting a custodial interrogation, law enforcement officers have the obligation to advise the suspect (1) of the right to remain silent and provide notice that anything said to the police might be used against him, (2) of the right to consult with an attorney prior to answering any questions and have the attorney present for questioning, (3) that counsel will be appointed for him if desired, and (4) that he can end questioning at any time. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). If, after waiving the *Miranda* rights and agreeing to speak to police, the suspect changes his mind and desires an attorney, the interrogation must cease until he has spoken to an attorney. *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981).

A problem arises when the interview subject makes a less than clear assertion of his right to speak to counsel. When initially facing this issue, the Washington Supreme Court ruled that police officers who face an equivocal assertion of the right to counsel must break off interrogation and seek to clarify the subject's desire. *State v. Robtoy*, 98 Wn.2d 30, 39, 653 P.2d 284 (1982). However, the United States Supreme Court

5

subsequently ruled that police need not clarify an equivocal request for counsel and need only stop interrogation when counsel is explicitly requested. *Davis v. United States*, 512 U.S. 452, 459, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994).

Subsequent to the briefing in this case, the Washington Supreme Court clarified that *Davis*, not *Robtoy*, governs equivocal assertions of the right to counsel during interrogation. *State v. Radcliffe*, 164 Wn.2d 900, 906-07, 194 P.3d 250 (2008). In light of *Radcliffe*, the appellant's argument fails. Assuming that his statements were even an assertion of the desire to have counsel before further conversation with the police,[2] they were at best unclear. He told the deputy that "if I am going to get charged" and "if it goes farther" he would need an attorney. Both are conditional statements of future intent. To the extent they could even have been construed to address his current situation, neither statement amounts to an unequivocal assertion that he now desired counsel. Under *Davis* and *Radcliffe*, these statements were not sufficient to require the deputy to break off questioning.

The trial court correctly found the statements to be equivocal and did not err in admitting Mr. Herron's interview at trial.[3]

---

[2] The two noted statements appear best read as indications that an attorney might be needed in the future if the case proceeded as opposed to a desire to have counsel before the interview proceeded further.

[3] In light of our ruling, we need not address the question of whether any error would have been harmful.

*Waiver of § 22 Right*

Although Mr. Herron does not argue that his waiver of his personal right to a public trial under § 22 was invalid, we need to briefly discuss the topic in order to place his other arguments in proper context. We conclude that the record shows that Mr. Herron knowingly and voluntarily gave up his right to have voir dire conducted in public.

The provision at issue states:

> **SECTION 22 RIGHTS OF THE ACCUSED.** In criminal prosecutions the accused shall have the right . . . to have a speedy public trial by an impartial jury of the county in which the offense is charged to have been committed.

CONST. art. I, § 22. This section, as quoted, was adopted in 1889 as an original provision of our constitution. Two of the noted rights secured by § 22 are at issue in this case—the right to a "public trial" and the right to "an impartial jury" to hear that trial.

In order to waive a constitutional right, there must be "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938). Our court has restated that standard this way: "the waiver of a fundamental constitutional right must be made knowingly, voluntarily, and intelligently." *State v. Thomas*, 128 Wn.2d 553, 558, 910 P.2d 475 (1996).

Mr. Herron waived *his* § 22 right to a public trial under these standards. He knew that he had the right to have voir dire conducted in the courtroom in the presence of any

7

member of the public who might have been in attendance. Suggestions were made that would have allowed him to conduct private voir dire in public. Believing that he would learn more by having the inquiries made in private, he expressly opted for questioning the jurors in chambers. He intentionally relinquished one known right in order to further his equally important right to obtain an impartial jury.

Mr. Herron clearly waived his right to a public trial. However, our constitution recognizes that Mr. Herron was not the only one who had a right to public proceedings in this case. The effect of his waiver on the rights of the public is the topic to which we turn next.

*Public Trial*

Mr. Herron argues that although he gave up his § 22 right to a public hearing, he did not waive the public's right under § 10. We conclude that he has no standing to assert the public's right and that even if standing had existed, his claim would fail under *State v. Momah*, 167 Wn.2d 140, 217 P.3d 321 (2009).

Art. I, § 10 provides:

**SECTION 10 ADMINISTRATION OF JUSTICE.** Justice in all cases shall be administered openly, and without unnecessary delay.

The history of § 10 is discussed in great detail in our recent decision in *In re Detention of Reyes*, No. 28167-1-III, 2013 WL 5297338 (Wash. Ct. App. Sept. 19,

8

2013).[4] In *Reyes*, a sexually violent predator action, the respondent had not asserted his § 10 right when a chambers hearing was conducted on his pretrial motion to dismiss. Following earlier precedent, we agreed that a civil litigant who does not assert his § 10 right at trial must establish prejudice in order to show manifest error that would allow him to raise the issue on appeal under RAP 2.5(a)(3) because a § 10 violation is not structural error. *Reyes*, slip op. at 28-29. We also concluded that Mr. Reyes lacked standing to assert the public's § 10 right under the traditional test for standing. *Id.* at 31-32. We did not rule categorically that a litigant would never have standing to assert the public's right.

*Reyes* noted that the rights created by the two provisions, although overlapping, are different. The rights conveyed by § 22 are personal to the criminal defendant.[5] However, § 10 functions as a command to the judiciary and is effectively a right held by all citizens of Washington. *Id.* at 11. A litigant has no special right under § 10 apart from the collective right held by all.[6] *Id.* at 11, 28. We also did not address the remedy for a § 10 violation. *Id.* at 25 n.15.

---

[4] *Reyes* was argued to this court the same day as Mr. Herron's case.

[5] *Federated Publ'n v. Kurtz*, 94 Wn.2d 51, 59-61, 615 P.2d 440 (1980).

[6] We questioned whether a litigant can "split" § 10 into both a personal right and a general public right by asserting the public's interest. *Reyes*, slip op. at 33.

Although instructive on certain aspects of this case, *Reyes* is not dispositive. For one thing, *Reyes* was not a § 22 case.[7] The Washington Supreme Court has yet to decide if a criminal defendant can assert the public's (i.e., § 10) open trial right. *Wise*, 176 Wn.2d at 16 n.9. The court typically has treated them as one and the same, even while acknowledging that they are different provisions serving complementary functions. *Momah*, 167 Wn.2d at 148. This is unsurprising since the § 22 criminal cases apply the same five factor test for closing a courtroom that was originally adopted for § 10 cases. *State v. Bone-Club*, 128 Wn.2d 254, 261, 906 P.2d 325 (1995).

Here, Mr. Herron's argument forces us to address the standing issue left open in *Wise*. Can a criminal defendant assert the public's § 10 rights in a criminal case? For several reasons, some specific to these facts, we conclude the answer is no.

First, we do agree with Mr. Herron that § 10 has application to a criminal case. That does not mean that it applies as he argues it should or that he has standing to argue it. We simply note that the command of § 10 is that justice "in all cases shall be administered openly." It, unlike § 22, is not limited to one particular type of case. § 10 has been used by third parties, typically the press, to intervene in criminal cases. *E.g.*, *Seattle Times v. Ishikawa*, 97 Wn.2d 30, 37-39, 640 P.2d 716 (1982) (newspaper challenge to closure of pretrial hearing in criminal case); *Federated Publ'n, Inc. v. Kurtz*,

---

[7] As a civil case, § 22 by its express terms ("In criminal prosecution") did not apply to *Reyes*.

94 Wn.2d 51, 615 P.2d 440 (1980) (same). But, as used by Mr. Herron here, he essentially is simply asserting § 10 as a second basis for having the public present during the individual voir dire. That is the same right guaranteed by § 22 that he already waived in the trial court. We can envision uses for § 10 by a party to a criminal case—such as the disclosure of sealed documents—that do not involve public presence in the courtroom.[8] However, when simply asserted as a redundant basis for the § 22 right, we do not believe § 10 has any independent effect as to the defendant. The waiver of one right was the waiver of the other.

Secondly, we conclude Mr. Herron does not have standing to assert the public's § 10 right in this case. We discussed § 10 standing in *Reyes*. *See Reyes*, slip op. at 31. Washington courts apply the three factor test of third party standing used by the United States Supreme Court:

> The litigant must have suffered an "injury in fact," thus giving him or her a "sufficiently concrete interest" in the outcome of the issue in dispute, . . . the litigant must have a close relation to the third party, . . . and there must exist some hindrance to the third party's ability to protect his or her own interests.

*Powers v. Ohio*, 499 U.S. 400, 411, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991) (internal citations omitted); *See T.S. v. Boy Scouts of Am.*, 157 Wn.2d 416, 424 n.6, 138 P.3d 1053

---

[8] It is also possible to envision that a prosecutor could invoke § 10 to challenge the closing of a hearing.

(2006) (citing *Mearns v. Scharbach*, 103 Wn. App. 498, 512, 12 P.3d 1048 (2000)); *State v. Burch*, 65 Wn. App. 828, 837, 830 P.2d 357 (1992).

As with Mr. Reyes, Mr. Herron cannot satisfy the three criteria. First, he has not claimed that he has suffered any "injury in fact" by the courtroom closure that he himself orchestrated.[9] He makes no showing that he has a particularly close relationship with the public at large or, even, any particular people who may have been present, which would permit him to assert their rights.[10] Finally, there is no reason to believe that the public could not have asserted its own interests in this case. As noted in *Reyes*, both the press and the general public have shown the ability in the past to use § 10 to challenge closed criminal and civil proceedings. *See Reyes*, slip op. at 18-20, 22-23.

He clearly does not have standing under traditional standards. Mr. Herron instead argues that because the *Bone-Club* test was not followed, the public's § 10 right was violated. While true in some respects, that argument begs the question of his standing to

---

[9] If Mr. Herron had actually desired to argue that he was harmed by the courtroom closure, his remedy was to argue ineffective assistance by his trial counsel. To simply argue on appeal that he had been harmed by the closure without addressing the tactical choice made at trial would present issues of both invited error and judicial estoppel. *E.g., State v. Studd*, 137 Wn.2d 533, 546, 973 P.2d 1049 (1999); *Anfinson v. FedEx Ground Package Sys., Inc.*, 174 Wn.2d 851, 861-62, 281 P.3d 289 (2012).

[10] We also question whether anyone can properly present the interests of another when those interests are inimical to his own. Here, for instance, Mr. Herron and his counsel thought that public voir dire was harmful to him. How he then could legitimately argue against that position on someone else's behalf is unknown and probably unknowable.

assert it. The trial court here did largely follow the *Bone-Club* test when it questioned the defendant over two hearings in order to obtain an informed decision from the defense concerning its preferred method of addressing any sensitive information. The only *Bone-Club* factors that it missed were the requirements that the public be given an opportunity to address the proposed closure and that any expressed concerns be weighed against the defendant's need to close the courtroom.[11] That was not done, probably because the process was decided upon at a different hearing than when the closure took place. Still, the existence of an error in the *Bone-Club* analysis does not mean that Mr. Herron is automatically entitled to third party standing to assert it. The existence of error is not itself a basis for third party standing. Mr. Herron must have more than that—and he does not.

Finally, we address Mr. Herron's claim that the error here was structural and therefore he is entitled to relief despite lack of standing.[12] We think he misconstrues *Momah*, which is not as limited in application as he believes.

---

[11] *Bone-Club*, 128 Wn.2d at 258-59.

[12] Mr. Herron has been represented at different times during the six years his case has been in this court by two experienced counsel who have filed excellent briefs in his behalf; his current counsel also presented a fine oral argument to the panel. His arguments have evolved over the past six years as the case law has evolved. We have chosen to address certain of his arguments while recognizing that others have fallen with the development of the law since his appeal was taken. Counsel's arguments were not disjointed, even if our approach to addressing them may make it appear so.

13

*Momah* involved a highly publicized prosecution for rape. Questionnaires were used to determine which members of the venire were aware of the case; those jurors were to be subject to individual questioning in chambers. *Momah*, 167 Wn.2d at 145-46. Defense counsel agreed to the process and also urged that *all* members of the venire undergo private questioning. *Id.* at 146. All counsel actively took part in the chambers questioning of the prospective jurors. *Id.* at 146-47. The trial court never undertook a public *Bone-Club* analysis before conducting the private questioning. *Id.* at 152 n.2.

The Washington Supreme Court held that the error in failing to conduct the *Bone-Club* analysis was not structural in nature and, since Mr. Momah could not demonstrate that he had been prejudiced, he was not entitled to a new trial. *Id.* at 156. The defense during jury selection balanced two § 22 rights—a public trial and an impartial jury. *Id.* Analogizing to invited error, even while acknowledging that it was not an exact fit, the court determined that the defense's agreement to the process and active participation in it took the case outside of the structural error context. *Id.* at 153-54. It stated:

> From the outset of trial, we presume Momah made tactical choices to achieve what he perceived as the fairest result. . . . As a result this closure and defense counsel's active participation in the questioning, Momah was able to exercise numerous challenges for cause, removing biased and partial jurors from the venire. We find all of these actions by Momah's counsel and the trial judge occurred in order to promote and safeguard the right to an impartial jury.

*Id.* at 155.

Noting that *Momah* has been characterized as a unique fact pattern[13] unlikely to be repeated, Mr. Herron argues that the *Bone-Club* error in his case does constitute structural error. We disagree. If anything, his case is more *Momah*-like than *Momah* itself. We say that primarily because here there was an express waiver by Mr. Herron of his own § 22 public trial rights for the limited purpose of jury selection. In *Momah*, the court dealt with what was essentially a waiver by conduct, which it applied only to the remedy rather than the determination of error.

Here, Mr. Herron expressly waived his right to have the private questioning of jurors done in public. He did so for the express purpose of furthering his right to an impartial jury. Thus, there was no § 22 error even though the *Bone-Club* analysis was not fully followed. As Mr. Herron was the only person who could raise a § 22 error, this case does not present a § 22 claim.[14] The only avenue of arguing public trial left to Mr. Herron was to raise the § 10 claim, something that we conclude he lacked the ability to do.

We do not fault the trial court for its error in not conducting the *Bone-Club* analysis. At the time of trial here, our court had not yet determined that chambers voir

---

[13] *See Wise*, 176 Wn.2d at 14-15.

[14] This fact distinguishes *Momah* from Mr. Herron's case, although not in a manner that favors Mr. Herron. Because there was not an express waiver of § 22 rights in *Momah*, Mr. Momah had the ability to raise the issue on appeal. Here, Mr. Herron cannot claim a violation of his § 22 rights due to his waiver and can only attempt to assert the public's § 10 rights.

dire constituted a closure of the courtroom. *See Strode,* 167 Wn.2d at 223, 227. Still, the court certainly at least had an inkling about the issue and attempted to clarify defense desires about the balance to be struck between public trial and an impartial jury. With the benefit of hindsight, we now know that *Bone-Club* was required. A trial court facing a new future unknown is well advised to conduct a *Bone-Club* analysis even if it is uncertain whether there is a necessity to do so.

Here, Mr. Herron expressly chose a course of action to seek an impartial jury at the expense of a small limitation on his right to public jury selection. Having knowingly and intelligently made that decision, he cannot assert § 22 error in this appeal. His attempt instead to assert the public's § 10 rights fails for lack of standing. Even though he correctly identifies an error in failing to follow the *Bone-Club* closure analysis, he lacks standing to assert that error on behalf of others under § 10 and cannot, unlike the defendant in *Momah,* assert his own rights under § 22 due to his waiver. For all of these reasons, we conclude that his public trial arguments fail.

The conviction is affirmed.

Korsmo, C.J.

WE CONCUR:

Brown, J.

Kulik, J.

16