IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No.  38826-3-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RANDY SHEA GARDNER | ) | PUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

STAAB, J. — Randy Gardner appeals his convictions for first degree murder, second degree assault, first degree unlawful possession of a firearm, and felony harassment.  After being handcuffed, placed in the back of a patrol vehicle, and read his *Miranda*[1] rights, Gardner told a detective that if he was a suspect, he wanted an attorney. Although police admitted that Gardner was a suspect at the time he made this statement, they did not end the interrogation or provide Gardner with an attorney.  The trial court denied Gardner's motion to suppress evidence from the subsequent interrogation, concluding that Gardner's request for an attorney was equivocal.  We disagree. Gardner's request for an attorney was conditional, not equivocal.  Since law enforcement knew that the condition was met, they should have ceased the interrogation until Gardner

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

was provided an attorney or reinitiated contact. We further conclude that the State failed to meet its burden of showing that the constitutional error was harmless beyond a reasonable doubt. Thus, we reverse and remand for a new trial.

BACKGROUND

*Preliminary Investigation*

This case centers around the murder of Julian Wabinga. The State alleges that sometime in August 2017, Gardner shot and killed Wabinga and buried his body in a barn on the property. Prior to his death, Wabinga lived on property owned by Patricia Reno, Gardner's then mother-in-law. Gardner, Ashley Heether (Gardner's wife at the time of Wabinga's murder), and Doug Irwin also lived on the property.

Gardner went to jail in October 2017, on unrelated charges. In November 2017, Heether filed for divorce against Gardner. About the same time, while in jail, Gardner contacted law enforcement and informed them that he believed Irwin had killed Wabinga and buried him in a barn located on the property. Law enforcement interviewed Gardner, went out to the property and, after receiving permission from Reno and Heether, searched the property with cadaver dogs but found nothing.

Gardner was released from custody in June 2018. Following his release, he walked out to the property from prison where he again contacted police about a body in the barn and asked them to come to the property. When police arrived, Gardner led them

2

to a corner of the barn where he dug up what was later determined to be Wabinga's body. Police also found a latex glove buried with Wabinga.

After he unearthed the body, Gardner went to the sheriff's office where he was interviewed by Detective Sergio Reyna and Detective Daniel Cypher. After speaking with Gardner, police also interviewed Heether, Reno, and Irwin. On June 13, police again brought Gardner in for questioning. Both interviews were recorded, and the second interview concluded with police arresting Gardner for Wabinga's murder.

*Pretrial Motion to Suppress*

Prior to trial, Gardner brought a motion to suppress the statements made during his interview with police on June 13, arguing that the statements from the interview were not voluntary. The trial court held a CrR 3.5 hearing at which both detectives who interviewed Gardner, Detective Cypher and Detective Reyna, and Gardner himself testified.

Detective Cypher admitted that Gardner was a suspect when he was questioned on June 13. Prior to questioning Gardner, Detective Cypher testified that Gardner was read his *Miranda* rights and he agreed to waive them. Detective Cypher said that another deputy picked up Gardner from his parents' home, placed him in handcuffs, and transported him to the sheriff's office for an interview. However, once he was in the interview room, Gardner was not in handcuffs.

According to Detective Cypher, at some point during the interview, Gardner asked to speak with an attorney, and questioning immediately stopped. Detective Cypher said that this was the first time Gardner had expressed a desire to speak with an attorney.

Detective Reyna testified consistently with Detective Cypher's testimony, including stating Gardner had not invoked his right to an attorney prior to the request that terminated the interview.

Gardner testified that Detective Reyna had told him that if he did not come in for questioning he would be arrested. On June 13 an unmarked police car arrived at his parents' house and he was instructed to get in the car. Gardner said he was placed in handcuffs and then transported down to the mailboxes by his parents' house "where there was probably another 20 sheriff [sic] cars." Rep. of Proc. (RP) (Moore) at 101. He said that Detective Reyna was there and Gardner told Detective Reyna that if he "was under arrest for [sic] a suspect," he wanted an attorney. RP (Moore) at 101. Detective Reyna then ordered the handcuffs removed.

Gardner was then transported to the sheriff's department where he said he subsequently asked both Detective Reyna and Detective Cypher if he was a suspect and said if he was, he would like an attorney present. He was told he was not a suspect. Detective Reyna and Detective Cypher then interviewed Gardner until he said he was done talking and they could talk to his attorney, at which point police arrested Gardner.

4

The June 13 interview itself was played during the hearing. The video shows that after Gardner was advised of his *Miranda* rights and waived them, Detective Reyna started out the interview by asking, "So, just so we can clear up some . . . additional stuff, you stated you wanted . . . to come over with an attorney?" Ex. 32 at 16 hrs., 22 min., 19 sec. Gardner responded that he had heard he was a suspect in the case from the Internet. Detective Cypher told him, "You know how the media is." Ex. 32 at 16 hrs., 22 min., 50 sec. The detectives then distracted Gardner with additional conversation, and the interview continued.

During its oral ruling, the trial court found that police had arrived at Gardner's parents' house and handcuffed him. The court found that Gardner told Detective Reyna that if he was a suspect, he wanted an attorney, at which point Detective Reyna ordered the handcuffs removed. Gardner was then taken to the sheriff's office where he was placed in a small room with no windows. He sat in a corner on a chair at a table. Detectives Cypher and Reyna were both present and placed themselves between Gardner and the door. Both officers were in plainclothes and although they were carrying their duty weapons, they did not display them. At no time was Gardner advised that he was free to leave.

Based on these findings, the trial court concluded that Gardner was in custody at this time because a reasonable person in Gardner's position would have felt their freedom was curtailed to the degree associated with a formal arrest. However, the trial court

5

further found Gardner's statements regarding an attorney were not unequivocal as to invoke his right to counsel and therefore concluded Gardner made a knowing, intelligent, and voluntary waiver of his rights. Accordingly, the court concluded Gardner's statements were admissible and denied his motion to suppress.

At a later time, the trial court also entered written findings on the motion. However, the trial court did not make any written findings regarding what had occurred prior to Gardner arriving at the sheriff's office on June 13, apart from the fact that he was transported to the sheriff's office.

*Trial*

The case proceeded to a jury trial. The State's case relied primarily on statements made by Gardner during interviews with the police and recorded phone calls and letters from jail. Additionally, the State called Gardner's now ex-wife, Ashley Heether, her mother, Alice Reno, Doug Irwin, and Gardner's former cell mate. The physical evidence was limited and included evidence that Wabinga was shot with Heether's gun and buried with a glove containing Irwin's DNA.

<u>Ashley Heether</u>

Heether testified at trial. She said that toward the end of her relationship with Gardner, he was constantly accusing her of seeing other people or being places she was not supposed to be. Heether said that Irwin and Wabinga were respectful toward her and her mother. Heether said that both she and Reno got along fine with Wabinga, and she

denied having an affair with him. According to Heether, Wabinga and Irwin got along very well and Gardner and Wabinga also generally got along well and "very rarely" argued. RP (Moore) at 753, 755.

Heether did remember one occasion, around the time Wabinga went "missing," when Gardner was upset with Wabinga because Gardner's vehicle that had been sitting on Wabinga's property had been impounded.

One day, within a couple weeks of Gardner's vehicle being impounded and sometime between July and August 2017, Heether heard yelling outside. She looked out the window and saw Irwin and Gardner standing in the yard while Wabinga walked toward his truck. Gardner then yelled to Wabinga, who was walking with Gardner's dog, "You're not taking my fucking dog". RP (Moore) at 759. Wabinga turned to bring the dog back, but Gardner walked toward him, shot him with a pistol owned by Heether, and Wabinga fell to the ground. Heether ran to be with her children in the back bedroom, and she heard two more shots.

About 45 minutes later, Gardner and Irwin came back into the house, and Irwin handed Heether her pistol. Gardner said, "I shot the fucker," and then both Gardner and Irwin went back outside. RP (Moore) at 765. Later that day, Gardner told Heether and Irwin that if anyone asked where Wabinga was, they were to say that he had either walked away or disappeared, and he told Heether that the crime would be pinned on her because Wabinga had been shot with her firearm.

7

Heether denied ever being made aware of the fact that Wabinga had been buried in the barn and said she never went into the barn between the time Wabinga was killed and when police discovered his body. Heether said she had not called the police because she was scared of what Gardner would do.

During Heether's testimony, the State introduced threatening statements made by Gardner to Heether in letters to her while he was in jail, including statements such as "I'm not going to be in here forever, [Heether]. You might want to think about that a little bit" and "I'm not letting you have a divorce. I'll make you a sex slave first." RP (Moore) at 942-58. He also appeared to threaten Heether with their children, at one point saying, "Are you trying to lose the kids? If not wake the fuck up and stop this stupid kid game. . . . If you go through this divorce we lose our kids plain and simple." Ex. 10. In another letter he said: "I told you I'm coming for my children. I will not tolerate anymore of your lies or little spoiled girl games. I have enough ammunition I can make sure you don't ever get to see them again." Ex. 4.

Heether also read potentially incriminatory statements from Gardner's letters, including the following excerpt:

> My parents have asked me if I killed him. And told me they were—told by
> your mom that I did. At this point does it even matter who shot [Wabinga]?
> He was shot based off of a bunch of lies told to make him out to be a
> predator and a bully. And maybe he was. But one thing I do know for sure
> is he didn't bully my son like my son was told to tell me. If your mom is
> telling the truth, then that would mean I shot and killed a man to defend my

8

children only to find out later that it was just one big lie. So what's right?
No big deal.

RP (Moore) at 966-67. Later on, in the same letter, Gardner stated, "It's what I deserved

for acting on lies and not making sure it's facts" and then said:

I have had to carry a huge burden on my shoulders for quite some time
now. And it is what it is. A man with a family that loved him lost his life.
And a family lost their dad, their son, their brother. All over lies told to me.
Shit's happening around the house when I wasn't home. I have never had
to carry the guilt of knowing that I was part of an innocent man losing his
life. I guess it's only fair that I lose my family too.

RP (Moore) at 968.

In another letter, Gardner noted that his letters were being read before they were

sent: "They've read all of my outgoing and incoming letters. Thus, the delay in mail and

the random letters . . . out of sequence." Ex. 6.

Defense counsel cross-examined Heether on prior inconsistent statements she had

made; including when she told Detective Reyna during an interview in November 2017,

that she had a "weird sixth sense" and got a "cold feeling in a spot" in the barn. RP

(Moore) at 835-36. Heether admitted that she previously said she had never really seen

Irwin and Wabinga interact. Heether admitted that she sold her pistol, which Gardner

used to kill Wabinga, but said she sold it to help pay Reno's power bill.

Heether also admitted that she had not been entirely forthcoming with police

during an interview conducted shortly after police found Wabinga's body, but following

a conversation with Reno after they had both spoken to the police she decided to provide

9

additional information. Heether said that she told police at the subsequent interview that

Gardner had told her that he and Irwin had "buried [Wabinga] in the barn." RP (Moore)

at 860, 862-63.

Doug Irwin

Irwin, who had moved onto the property to help Gardner with odd jobs, testified at

trial. He said Wabinga was already living on the property when he arrived and that he

and Wabinga had gotten along well. Irwin remembered Gardner accusing Heether of

having an affair with Wabinga.

Irwin also testified about the events surrounding Wabinga's death. Irwin said that

Gardner had learned that a truck Gardner had been storing at Wabinga's property had

been impounded and Gardner became irate. Gardner confronted Wabinga and asked him

why he had his truck impounded. Wabinga then walked toward his truck while Gardner

continued to try to argue with him. Gardner told Wabinga that Wabinga was not going to

take the dog, and Wabinga replied that he just wanted to go. Gardner then pulled out a

gun and shot Wabinga in the back of the leg and Wabinga fell to the ground. Gardner

approached Wabinga on the ground and shot him in the head as Wabinga pleaded for his

life.

Gardner next turned and pointed the gun at Irwin, telling him not to tell anyone

otherwise he would do the same thing to his family. After that, Gardner tossed him the

gun and instructed him to give it back to Heether, which Irwin did. At Gardner's

10

direction, Irwin helped move the body into the barn and bury it there while Gardner continued to threaten him not to say anything or he would hurt Irwin's family.

After Gardner was arrested, Irwin continued to live on the property until he left in November 2017, around the same time police first came to the property to look for a body. Irwin denied leaving because the police were coming to the property; he claimed instead that he left because Gardner and his wife were going through a divorce, and it was suggested that he leave to avoid being in the middle of the situation. However, Irwin subsequently admitted that he left for "safety" reasons. He said he did not contact law enforcement about Wabinga's murder because he feared for his and his family's safety.

Irwin admitted that he was wearing gloves when he helped bury Wabinga, but he did not remember having a conversation with police regarding gloves found with Wabinga's body.

Patricia Reno

Reno, Heether's mother, also testified. She lived on the property with Heether, Gardner, Irwin, and Wabinga. She noted that after Wabinga disappeared, she asked Gardner where he was. Gardner told her he and Wabinga had gotten into a fight and Wabinga "went off walking." RP (Anderson) at 133. Reno noted that Wabinga had left his vehicle, wallet, keys, and dog behind. Gardner later told her, "[A]ll I can tell you, when I left him he was breathing, but I don't think he will ever be back." RP (Anderson) at 137.

11

Reno also said that in June 2018 Gardner told her that Heether was going "to jail for a long, long time." RP (Anderson) at 138. Reno asked Gardner what he was talking about, and he took her into the barn. Gardner brushed some dirt away from the ground and said, "he's right there." RP (Anderson) at 139.

### Lieutenant Robert Tucker

Lieutenant Tucker, who responded to Gardner's June 2018 call to police reporting a body in the barn, testified at trial. When he arrived at the property, Gardner told him that he believed Heether and her "new boyfriend" had Irwin kill Wabinga "as a debt that he owed." RP (Moore) at 1064. Gardner also told Lieutenant Tucker that his wife and her boyfriend had Irwin kill Wabinga after Wabinga caught them having sexual intercourse. RP (Anderson) at 226-27.

Gardner led Lieutenant Tucker to a spot in the barn. Gardner started digging and eventually unearthed what turned out to be Wabinga's body. While Gardner was digging, he told Lieutenant Tucker that Reno and Heether had Irwin kill Wabinga because Wabinga caught Heether and her boyfriend having sex, stole jewelry from Reno, and "used her bathroom to go to the bathroom and left it there." RP (Moore) at 1074.

### Additional Testimony

The forensic pathologist who conducted Wabinga's autopsy determined that his cause of death was a bullet wound to the head.

12

Detective Reyna interviewed Gardner in November 2017, while he was in jail, after he made allegations that Wabinga's body was buried in the barn on the property. Gardner said that he and Irwin had been drinking one day, and Irwin told him that Wabinga was "in the barn." RP (Anderson) at 248.

After Detective Reyna interviewed Gardner, he went to the property with other law enforcement officers and cadaver dogs to search for the body in the barn. After finding nothing, law enforcement left the property.

Detective Reyna also interviewed Gardner on the day he dug up Wabinga's body. During the interview, Gardner maintained that Irwin had shot Wabinga and that he had been working for Reno and his wife. Gardner also said Irwin was the one who had buried Wabinga. That interview was played for the jury.

Arthur Hentze, a former cellmate of Gardner's, testified. Hentze said that Gardner confessed to shooting a man and burying him and then using the man's Chevy truck. Gardner told Hentze that he, his wife, and another guy had all taken turns shooting the man.

Hentze admitted he had entered into a cooperation agreement with the State. He had been charged with first degree robbery with a firearm enhancement and was facing life in prison but instead received a reduced sentence in exchange for testifying against Gardner.

Gardner's father also testified about a phone call he had with Gardner while he was in jail. The phone call was played for the jury. During the call, Gardner told his father that if he walked in the back door of the barn, "there's a set of trailer fenders right there, that's where he's at." Ex. 33 at 11 min., 45 sec. He then clarified that "he" meant Wabinga. Ex. 33 at 12 min., 20 sec.

The father explained that the police took cadaver dogs over there and looked but there was nothing there. Gardner insisted that there was a body in the barn, and when his father pushed back, he said, "I watched him put him there." Ex. 33 at 13 min., 25 sec.

Video of Gardner Digging

The State also introduced into evidence the video of Gardner digging up Wabinga's body. During the video, Gardner told an officer that Heether told him that Irwin had shot Wabinga with Heether's gun when Gardner went to prison. He also said that Heether had shown him the place in the barn where Wabinga was buried.

During the digging, two other officers arrived. One of the officers asked, "How far down [inaudible]?" and Gardner responds, "Probably a foot and a half." Ex. 12 at 3 min., 40 sec. The officer who asked the question said he had asked Gardner "how deep he was" and that he was referring to the body. RP (Moore) at 1085. The officer then asked which way the body was laying, and Gardner said he was not sure. One officer also asked Gardner why Irwin would have shot Wabinga. Gardner said Wabinga was

14

stalking Heether, stole from his mother-in-law Reno, and supposedly bullied Gardner's son.

> November 17 and June 5 Interviews

Gardner interviewed with Detective Reyna after he notified police of the body in the barn on the property in November 2017, and this interview was played for the jury. Gardner remembered that, prior to Wabinga's disappearance, Reno started accusing Wabinga of stealing jewelry from her bedroom. He subsequently said that he believed Irwin had killed Wabinga and buried him in the barn on the property afterward.

Gardner's interview with Detectives Cypher and Reyno from June 5, the date he dug up Wabinga's body, was also shown to the jury. During this interview, Gardner blamed Heether for Wabinga's death along with Irwin. Gardner said that Reno and Heether's attitudes toward Wabinga changed prior to his disappearance. Reno started accusing Wabinga of stealing jewelry from her and then Gardner heard he was stalking Heether and may have been aware of an affair between Heether and another man. Gardner said that Wabinga may have seen "something" and "they"[2] may have started making accusations about Wabinga to get him out of there. Ex. 30 at 15 hrs., 23 min., 20 sec. Gardner's child also accused Wabinga of bullying him.

---

[2] It is unclear who "they" are.

15

Gardner also said that Irwin had told him he had "smoked that fool" two weeks before Gardner had been arrested and Heether had told him that there was a "cold spot" in the barn a few days prior to his arrest. Ex. 30 at 15 hrs., 24 min., 48 sec.; 25 min., 3 sec. Irwin told Gardner not to say anything to anyone otherwise he would "put a bullet in your wife and your kids." Ex. 30 at 15 hrs., 26 min., 44 sec. Gardner then said that Reno had accused him of setting Irwin up for murder.

Gardner informed the detectives he believed the body that had been found in the barn was Wabinga's because he had disappeared around the middle or end of September without his truck and Gardner had not heard from him or been able to get a hold of anyone who had. Gardner said the last time he saw Wabinga was before Gardner had left to go do some work but that it was common for Wabinga to disappear for months at a time. Gardner said Wabinga and Reno did not get along and Reno had never liked him.

Gardner again said he knew about the body in the barn because Heether had been in the barn with him just before he went to prison and told him there was a "cold spot" in the area where the body was. Gardner said that Heether had told him somebody was buried there and she thought it was Wabinga.

Later in the interview, Gardner began crying and said Heether had told him that Irwin had killed Wabinga because Reno had told him to after Wabinga had walked in on Heether having sex with her new boyfriend. He said that after Wabinga caught Heether and her boyfriend, Reno and Heether started making allegations about Wabinga stealing

16

stuff from the house, stalking them, and leaving "a big ol' shit" in Reno's bathroom. Ex.
30 at 16 hrs., 38 min., 43 sec. After that, Gardner said that he was told that Wabinga was
bullying one of Gardner's children. And Gardner said Heether and Reno were making
the same accusations about Wabinga to Irwin.

According to Gardner, after Heether and Reno started making accusations, he
encouraged Wabinga to leave for a while, but Wabinga said he had work to do. Then
Heether told Gardner that if Wabinga did not leave, she was going to "go get her gun and
tell him to leave herself." Ex. 30 at 17 hrs., 17 min., 3 sec. Gardner told the detectives
that Heether had handed Irwin the gun before Gardner left that day to do a job. He came
back from the job and was told by Irwin and Heether that Wabinga had walked off.
Gardner did not know whether Heether or Irwin had shot Wabinga, but he thought they
both had dug the hole where Wabinga was buried because they were at the back side of
the barn stomping on dirt in the area where Wabinga was buried when Gardner returned
from the job.

June 13 Interview

Portions of the June 13 interview were also published to the jury. The initial
conversations between Gardner and the detectives focused on Gardner's cell phone,
which had been seized, and the latex glove found in the hole where Wabinga was buried.
The detectives asked Gardner to guess whose DNA was found on the glove. Gardner
guessed Heether and Irwin, and the detectives confirmed that it was Irwin's DNA. Upon

17

hearing this, Gardner expressed continuing concern for the safety of his children who were in the care of his ex-wife.

The detectives also questioned Gardner about the timeline of events and when Wabinga went missing. Gardner could not remember a date but stated that it must have been after school started in mid-August because he remembered taking his son to school with Wabinga. Gardner's statements about which school the child was attending were inconsistent and the detectives pointed this out to Gardner. Ultimately, Gardner estimated that Wabinga disappeared some time in mid-September.

Gardner stated that at that time he was working on a project at another location. One morning before leaving, Gardner told Wabinga that Heether and Reno wanted Wabinga gone because Wabinga was using too much electricity. Gardner said he told Wabinga to take off for a few days. Later in the interview, Gardner said that before leaving for work that same morning he saw Heether hand her gun to Irwin while indicating that she was going to go talk to Wabinga. Gardner said he expressed frustration to Heether, telling her that he had already told Wabinga to leave but that Wabinga wanted to finish a project at the house. Gardner said that when he returned from work that day, Heether and Irwin told him that Wabinga took off on foot and would be back for his truck later.

Gardner also told the detectives that shortly before getting arrested, Heether told Gardner that there was a cold spot in the barn and then admitted that Wabinga was buried

18

there and pointed to a spot in the barn.  Around the same time, Irwin had several drinks

and admitted to Gardner that Irwin "smoked him," and pointed to the barn.  Ex. 32 at 17

hrs., 1 min., 3 sec.

Gardner denied suspecting Wabinga of having an affair with Heether.  He also

denied that he confessed to killing Wabinga in his letters from jail.  At the end of the

interview, one of the detectives began making accusations against Gardner, telling

Gardner that he read Gardner's letters and thought the letters spoke volumes.  He went on

to accuse Gardner of being a "control freak" and using his kids as pawns.  Ex. 32 at 17

hrs., 8 min., 57 sec.  When the detective suggested that Gardner admitted killing Wabinga

in the letters, Gardner said, "we're done until I have an attorney here."  Ex. 32 at 17 hrs.,

10 min., 46 sec. through 17 hrs., 11 min., 47 sec.  Even after making this statement, the

detective continued to talk to Gardner as they collected their stuff to leave the room.  One

of the detectives even commented, "we're trying to clear some stuff up but you want to

talk to an attorney . . . and that's a shame."  Ex. 32 at 17 hrs., 12 min., 4 sec.

Ultimately, the jury found Gardner guilty of first degree murder, second degree

assault, unlawful possession of a firearm, and felony harassment, but acquitted him of the

witness intimidation charge.

Gardner appeals.

ANALYSIS

Gardner argues that the trial court abused its discretion and violated his Fifth Amendment right to the United States Constitution when it denied his motion to suppress his June 13 interview because detectives continued questioning him after he unequivocally requested counsel. We agree and conclude that the error was not harmless beyond a reasonable doubt.

1.    REQUEST FOR AN ATTORNEY

A trial court's conclusions of law regarding suppression of evidence are reviewed de novo. *State v. Fry*, 168 Wn.2d 1, 5, 228 P.3d 1 (2010). Unchallenged findings of fact are considered verities on appeal. *State v. Brockob*, 159 Wn.2d 311, 343, 150 P.3d 59 (2006). A trial court's findings of fact to which an appellant assigns error are reviewed for substantial evidence. *Id*. "Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the finding's truth." *State v. Pratt*, 11 Wn. App. 2d 450, 457, 454 P.3d 875 (2019). This court reviews claims of constitutional error de novo. *State v. Price*, 169 Wn. App. 652, 655-56, 281 P.3d 331 (2012).

The Fifth Amendment protects against self-incrimination. *State v. Templeton*, 148 Wn.2d 193, 207, 59 P.3d 632 (2002). Accordingly, law enforcement officers are required to give *Miranda* warnings where an individual is subjected to custodial interrogation. *State v. Post*, 118 Wn.2d 596, 605, 826 P.2d 172 (1992). Prior to being subjected to custodial interrogation, *Miranda* requires that an individual must be informed of their

right to remain silent and their right to an attorney. *Miranda*, 384 U.S. at 479. If a suspect requests an attorney, law enforcement must stop all questioning until an attorney has been provided or the suspect reinitiates talking on their own. *State v. Radcliffe*, 164 Wn.2d 900, 906, 194 P.3d 250 (2008).

"Once a suspect indicates that he or she is not capable of undergoing custodial questioning without the advice of counsel, any subsequent *Miranda* waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of inherently compelling pressures and not the purely voluntary choice of the suspect." 21A AM. JUR. 2D *Criminal Law* § 903 (2016). "A suspect's responses to further questioning cannot be used to cast doubt upon the adequacy of his initial request." *Smith v. Endell*, 860 F.2d 1528, 1529 (9th Cir. 1988).

However, once a suspect waives his *Miranda* rights, only an unequivocal request for an attorney requires law enforcement to cease questioning. The request for counsel must be sufficiently clear that a reasonable officer would know that *Miranda* has been invoked. *Davis v. United States*, 512 U.S. 452, 459, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994). Conversely, a request that is ambiguous or equivocal, such that a reasonable officer under the circumstances would understand that the suspect might be interested in obtaining an attorney, does not require the officer to cease questioning. *Id*. Whether a request is unequivocal or ambiguous is a bright-line objective inquiry. *State v. Piatnitsky*,

180 Wn.2d 407, 413, 325 P.3d 167 (2014). As such, it is a question of law that we review de novo. *Id.*

In this case, the trial court concluded that Gardner was subjected to custodial interrogation and this determination has not been challenged by the State. Gardner testified, and the trial court found in its oral ruling, that after he was placed in handcuffs, he informed Detective Reyna that if he was a suspect, he wanted an attorney. And the uncontroverted testimony at the hearing was that Gardner was in fact a suspect at the time of the June 13 interview. Given these findings, the only question before us is whether the trial court erred in concluding that Gardner's request for an attorney was equivocal.

As a preliminary matter, we address the State's argument that we should not consider the court's oral finding because it was not included in the written finding. Where an oral decision conflicts with a written decision, the written decision is controlling. *Grieco v. Wilson*, 144 Wn. App. 865, 872, 184 P.3d 668 (2008). However, "[w]hen findings are incomplete, appellate courts may look to the trial court's oral decision to interpret the judgment." *City of Lakewood v. Pierce County*, 144 Wn.2d 118, 127, 30 P.3d 446 (2001).

The State fails to explain, and it is not readily apparent, how the trial court's oral finding conflicted with the written decision; on the contrary, there is no finding in the written decision regarding the statements made by Gardner prior to his interrogation. In addition, the oral finding is supported by the evidence. Not only did Gardner testify that

he made the request, but at the beginning of the interview, the detectives asked Gardner

about his earlier statement that he wanted to come over with an attorney, and Gardner

responded that he had heard he was a suspect. Thus, we disagree with the State's

argument that we should not consider the trial court's oral finding.

On appeal, Gardner challenges the trial court's conclusion that his request for an

attorney if he was a suspect was equivocal and thus did not require law enforcement to

cease questioning. Under similar circumstances, our court has held that a conditional

request such as this is unequivocal. In *State v. Pierce*, 169 Wn. App. 533, 537, 280 P.3d

1158 (2012), the defendant was arrested and interrogated for stealing the victims' debit

card. When police began accusing the defendant of murdering the victims, he stated, "'If

you're . . . trying to say I'm doing [sic] it I need a lawyer. I'm gonna need a lawyer

because it wasn't me. You're wrong.'" *Id*. at 539. While police ended the interrogation,

they did not put the defendant in contact with an attorney. *Id*. Five hours later, the

defendant reinitiated a conversation and made admissions. *Id*. at 540.

The defendant challenged the admission of his subsequent statements, arguing that

by failing to immediately put him in contact with an attorney, police violated his rule-

based right to an attorney under CrR 3.1(c)(2). *Id*. at 541. Division Two agreed,

concluding as a preliminary matter that the defendant's statement was a conditional, but

unequivocal, request for an attorney. *Id*. at 546-47. The court noted that it might reach a

different result if the condition had not been met, i.e., the police had not yet accused the

defendant of murder. *Id* at 546. But when the defendant made this statement, police had already accused him of murder. *Id*. "Coupled with his immediately following statement that he was 'gonna' need a lawyer, Pierce's conditional language did not render his request for counsel equivocal." *Id*.

The Ninth Circuit has reached the same result under similar circumstances. In *Smith v. Endell*, 860 F.2d 1528, 1529 (9th Cir. 1988), the defendant was arrested, given his *Miranda* rights, and elected to waive them. After talking with law enforcement for about an hour, he was asked whether he had shot his drug dealer. *Id.* The defendant denied it and when he was pressed further expressed a desire to speak with an attorney:

> Can I talk to a lawyer? At this point, I think maybe you're looking at me as a suspect, and I should talk to a lawyer. Are you looking at me as a suspect?

*Id*. Law enforcement continued to question the defendant, even though he was in fact a suspect at that point. *Id*. at 1529-30, 1532. The Ninth Circuit held that the defendant's statement, though conditional, was unequivocal and clearly invoked his right to counsel given that the condition, whether he was a suspect, was in fact met:

> Smith's initial request was clear enough: if the troopers regarded him as a suspect in the murder of Ron and Darcelle Cole, he wanted an attorney. The request was not ambiguous; Smith was uncertain whether the troopers considered him a suspect, but if they did, his intent was clear: "I should talk to a lawyer." In this respect his statement was not equivocal; there was no "might" or "maybe" or "perhaps."
>
> We agree with the magistrate that Smith's request was conditional; it was not to be operative unless the troopers suspected Smith of the murders;

> if they did, however, Smith wanted counsel. The troopers could not have mistaken Smith's meaning. Since they knew him to be a suspect, questioning should have stopped until an attorney was present, unless Smith himself initiated its renewal.

*Id*. at 1531-32.

Here, like *Pierce* and *Smith*, Gardner told law enforcement that if he was a suspect, he wanted an attorney when he was taken in for questioning on June 13. Gardner was in fact a suspect at that point. This was a conditional request—if this, then that. There was nothing ambiguous about this request. Gardner was unsure whether he was a suspect, but if he was, he wanted an attorney. Law enforcement knew that the condition had been met because they knew that Gardner was a suspect. Because law enforcement knew that the condition had been met, Gardner's statement was a clear invocation of his right to counsel.

The State contends that our Supreme Court's decision in *Piatnitsky* controls rather than the Ninth Circuit decision in *Smith*. In *Piatnitsky*, law enforcement conducted a post-arrest interview with the defendant who indicated that he would give a recorded confession. 180 Wn.2d at 409. But when the recording started, the defendant stated, "I don't want to talk right now," but explained that he would just write it down. *Id*. at 409-10. The Supreme Court rejected the defendant's claim that his statement was an unequivocal request to cease questioning. *Id*. at 411-12. Instead, the court concluded that under the circumstances the detectives reasonably believed the defendant was

expressing a preference to provide a written statement rather than a recorded statement, and "any invocation of his *Miranda* rights was equivocal at best." *Id*. at 412-13. The court concluded that the defendant's statement was a conditional invocation of *Miranda* and must be viewed as equivocal or ambiguous. *Id*. at 415.

We do not read *Piatnitsky* to hold that every conditional invocation of *Miranda* rights is an equivocal invocation. In *Piatnitsky*, the defendant put conditions on his statement by indicating he would provide a written statement but not a recorded statement. Here, Gardner was not putting conditions on how he wanted to give a statement; he was putting absolute conditions on whether he wanted an attorney before going forward. There is nothing ambiguous about Gardner's statement.

The State also cites *State v. Herron*, 177 Wn. App. 96, 318 P.3d 281 (2013), in support of its position. In *Herron*, the defendant told police "if I am going to get charged," and "if it goes farther," he would need an attorney. *Id*. at 103. The court found that these were "conditional statements of future intent." *Id*. at 103. "To the extent they could even have been construed to address his current situation, neither statement amounts to an unequivocal assertion that he now desired counsel." *Id*. The condition in *Herron* is clearly distinguishable from the condition in this case, primarily because the condition in *Herron* had not been met but instead reflected a future possibility.

Gardner made an unequivocal request for counsel if a condition was met. Police knew that the condition was met but continued to question Gardner in violation of

26

*Miranda*. The subsequent *Miranda* warnings given to Gardner and Gardner's waiver did not cure any violation because further questioning cannot be used to undermine an unequivocal request for counsel. *Smith*, 860 F.2d at 1529.

2.      ERROR WAS NOT HARMLESS

Determining *Miranda* had been violated, this court now turns its attention toward the question of whether this violation was harmless. Evidence obtained in violation of *Miranda* infringes on a defendant's Fifth Amendment right against self-incrimination, and its admission at trial is presumed to be prejudicial. *State v. Miller*, 131 Wn.2d 78, 90, 929 P.2d 372 (1997). Consequently, we apply the constitutional harmless error standard where the burden shifts to the State to show beyond a reasonable doubt that the error did not contribute to the verdict. *State v. Jasper*, 174 Wn.2d 96, 117, 271 P.3d 876 (2012).

> "Whether such an error is harmless in a particular case depends upon a host of factors . . . includ[ing] the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case."

*State v. Scanlan*, 2 Wn. App. 2d 715, 732-33, 413 P.3d 82 (2018) (alteration in original) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986)). A reviewing court must look at whether the "untainted evidence admitted is so overwhelming as to necessarily lead to a finding of guilt." *State v. Davis*, 154 Wn.2d 291, 305, 111 P.3d 844 (2005).

27

Here, given these factors, we are not convinced beyond a reasonable doubt that the error was harmless. First, we note that all of the charges for which Gardner was convicted depend on the same allegations made by Irwin and Heether. Gardner's admissions and statements were critical to the State's case. The State did not even know that a crime had been committed until Gardner contacted them with information about a murder.

At trial, the State relied on multiple interviews with Gardner, along with recorded phone calls and letters from Gardner while he was in jail, to support the charges against him. These statements were important not only for what Gardner said, but for what he did not say, and for what he said inconsistently. While some of the comments Gardner made on June 13 were redundant, he also made statements that were inconsistent with earlier statements and even within this interview.

The June 13 interview also contained prejudicial statements from both Gardner and the police. The jury heard Gardner talk about an earlier burglary charge for which he was serving a sentence at the time he first contacted police. Gardner mentioned that his codefendant had gone into the home where the invasion had occurred and "started beating on the people." Ex. 32 at 16 hrs., 53 min., 25 sec. Toward the end of the interview, one of the detectives made a lengthy accusation against Gardner, calling him a "control freak," accusing him of using his kids as pawns, and telling Gardner that his

28

letters from jail were an admission of guilt. Ex. 32 at 17 hrs., 8 min., 9 sec. through 17 hrs., 10 min., 38 sec. The relevance of this diatribe is not clear.

The only physical evidence admitted at trial showed that Wabinga was shot with Heether's gun and buried with a latex glove containing Irwin's DNA.

Otherwise, the State's case relied largely on the testimony of several key witnesses with credibility issues. At trial, Irwin and Heether testified that Gardner shot Wabinga and then handed the gun to Irwin who gave it to Heether, who admittedly sold the gun at a later date. All three witnesses told different versions of the events throughout the investigation and trial. Moreover, even though Heether and Irwin admittedly knew that Wabinga had been murdered, neither one made any attempt to contact law enforcement even after Gardner was jailed on different charges. Irwin left the area when police began investigating the property.

The State also called Gardner's cell mate, who avoided a third strike offense by testifying that Gardner confessed to the murder while in custody.

We acknowledge that the State's evidence against Gardner, including his own statements and admissions, were significant. But it was not overwhelming. Moreover, Gardner's statements, including his interview on June 13, were key pieces of evidence for the State. As such, we are not convinced beyond a reasonable doubt that the admission of the June 13 interview did not contribute to the verdict. Consequently, the error in admitting the interview was not harmless.

29

No. 38826-3-III
*State v. Gardner*


       Because we reverse and remand for a new trial, we decline to address the other

issues raised by Gardner on appeal.

_____
             Staab, J.

WE CONCUR:

_____
     Cooney, J.

_____
     Lawrence-Berrey, C.J.

30